UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:09-cr-00024-JAW |
| | ) | 1:13-cr-00001-JAW |
| JAMES M. CAMERON | ) | |

**ORDER ON GUIDELINES CALCULATION**

Convicted of seven counts of transporting, receiving, and possessing child pornography, and of contempt of court, James M. Cameron raises a series of sentencing issues. The Court concludes that:

1) it will not consider conduct underlying vacated counts in making its Guideline calculations and will apply a three-level enhancement for between 150 and 300 images under United States Sentencing Guideline (USSG) § 2G2.2(b)(7)(B);

2) it will apply the four-level enhancement for sadistic or masochistic conduct under USSG § 2G2.2(b)(4);

3) it will apply the five-level enhancement for distribution of child pornography in exchange for receipt of a thing of value under USSG § 2G2.2(b)(3)(B); and

4) it will apply the two-level enhancement for obstruction of justice under USSG § 3C1.1 and the three-level enhancement for violation of 18 U.S.C. § 3147 under USSG § 3C1.3.

Finally, the Court clarifies the factors appropriate for an award of restitution in light of recent caselaw.

## I.     BACKGROUND

On February 11, 2009, a federal grand jury returned a sixteen-count indictment charging Mr. Cameron with knowingly transporting, receiving, and possessing child pornography in violation of 18 U.S.C. § 2252A(a)(1), (a)(2), and (a)(5)(B). *Indictment* (ECF No. 3).[1]  The Government dismissed Count 16 before trial. *Oral Order Granting Oral Mot. to Dismiss Count 16 of the Indictment by USA* (ECF No. 183) (Aug. 23, 2010).  On August 23, 2010, after a six-day bench trial, the Court acquitted Mr. Cameron of Counts 2 and 8 and convicted him of the remaining thirteen counts. *Oral Ct. Verdict* (ECF No. 179).  On March 11, 2011, the Court sentenced Mr. Cameron to 192 months in prison. *J.* at 2 (ECF No. 241); *United States v. Cameron*, No. 1:09-cr-00024-JAW, 2011 U.S. Dist. LEXIS 24878, at *57-58 (D. Me. Mar. 11, 2011).

On November 14, 2012, the United States Court of Appeals for the First Circuit issued an opinion upholding Mr. Cameron's convictions on Counts 6, 7, 9, 10, 12, 13, and 15, but reversing his convictions on Counts 1, 3, 4, 5, 11, and 14. *United States v. Cameron*, 699 F.3d 621, 654 (1st Cir. 2012).  The First Circuit overturned the counts relating to Mr. Cameron's upload of child pornography images to his

---

[1]     Mr. Cameron is the subject of two criminal proceedings.  The original proceeding involving child pornography is under docket number 1:09-cr-00024-JAW and the second involving his flight while on bail is under docket number 1:13-cr-00001-JAW.  The Court's general ECF docket entry references in this Order are to docket number 1:09-cr-00024-JAW.  If the reference is to an ECF docket entry in 1:13-cr-00001-JAW, the Court notes it.

Yahoo! accounts, finding that admission of Yahoo! receipts associated with those uploads and admission of CyberTipline Reports from the National Center for Missing and Exploited Children (NCMEC) violated his rights under the Confrontation Clause of the Sixth Amendment. *Id.* at 641-52. The First Circuit vacated Mr. Cameron's sentence "as to those counts" that it reversed, *id.* at 654, and suggested that on remand this Court "consider . . . whether its original calculation of the number of photos attributable to Cameron is still valid in light of the reversal of the convictions on Counts One, Three, Four, Five, Eleven, and Fourteen." *Id.* at 653.

The First Circuit upheld the convictions on counts relating to Mr. Cameron's transmission and receipt of child pornography images over GoogleHello (Counts Six, Seven, Nine, Twelve, and Thirteen). *Id.* at 652. It also affirmed Mr. Cameron's conviction on Count Ten, knowing receipt of child pornography, and his conviction on Count Fifteen, knowing possession of child pornography. *Id.* Although the First Circuit reversed Mr. Cameron's "convictions on Counts One, Three, Four, Five, Eleven, and Fourteen, and vacate[d] his sentence as to those counts," it remanded the case, including the reversed counts, to this Court "for further proceedings consistent with this opinion, including a new trial on Counts One, Three, Four, Five, Eleven, and Fourteen, if the government wishes to so proceed." *Id.* at 654. On January 14, 2013, the Government filed a notice of intent, stating that it "will ask the Court to resentence Defendant on Counts 6, 7, 9, 10, 12, 13 and 15 of the Indictment." *Gov't Am. Notice of Intent* at 1 (ECF No. 320). The Government

represented that after resentencing, "it is the Government's intention to move to dismiss Counts 1, 3, 4, 5, 11, and 14." *Id.* The Government noted that it dismissed Count 16 before trial and that the Court acquitted Mr. Cameron on Counts 2 and 8. *Id.*

The day after the First Circuit issued its decision, Mr. Cameron fled the state of Maine in violation of his release conditions.[2] *United States v. Cameron*, No. 1:13-cr-00001-JAW, *Prosecution Version* at 2 (ECF No. 15). The Government moved to revoke his release and requested a warrant for his arrest. *Mot. to Revoke Bail and Issue Arrest Warrant* (ECF No. 299) (Nov. 15, 2012). On December 2, 2012, Mr. Cameron was arrested on that warrant in Albuquerque, New Mexico. *United States v. Cameron*, No. 1:13-cr-00001-JAW, *Prosecution Version* at 2. On January 2, 2013, the Government filed a notice charging Mr. Cameron with criminal contempt in violation of 18 U.S.C. § 401(3). *United States v. Cameron*, No. 1:13-cr-00001-JAW, *Notice/Information* (ECF No. 1). On February 19, 2013, Mr. Cameron entered a guilty plea to the criminal contempt charge. *United States v. Cameron*, No. 1:13-cr-00001-JAW, *Minute Entry* (ECF No. 16).

The Government filed a memorandum in aid of re-sentencing on July 19, 2013. *Gov't's Mem. in Aid of Re-Sentencing* (ECF No. 327) (*Gov't's Mem.*). The Court held a presentence conference on August 20, 2013. *Minute Entry* (ECF No.

---

[2]    Mr. Cameron was on bail with GPS ankle monitoring pending resolution of his appeal. *United States v. Cameron*, 756 F. Supp. 2d 148 (D. Me. 2010) (denying motion for release pending sentencing); No. 1:09-cr-00024-JAW, 2011 U.S. Dist. LEXIS 49809 (D. Me. May 9, 2011) (denying motion for release pending appeal); *Order of United States Court of Appeals for the First Circuit* (ECF No. 267) (Aug. 9, 2011) (granting motion for bail pending appeal); 2011 U.S. Dist. LEXIS 89629 (D. Me. Aug. 11, 2011) (releasing Mr. Cameron on bail in accordance with the First Circuit order).

328). Mr. Cameron filed a sentencing memorandum on August 29, 2013. *Def. Mem. Addressing Unresolved Guideline Calculation Issues* (ECF No. 329) (*Def.'s Mem.*). The Government replied on September 6, 2013. *Gov't's Reply Mem. in Aid of Re-Sentencing* (ECF No. 330) (*Gov't's Reply*).

The Probation Office (PO) prepared the customary Presentence Investigation Report (PSR) in this case, and Mr. Cameron is now prepared for resentencing on the child pornography case and sentencing on the criminal contempt charge. At the presentence conference, the Court asked the parties' opinions as to the scope of the remand; both the Government and Mr. Cameron agree that the remand includes resentencing de novo. *Gov't's Mem.* at 10; *Def.'s Mem.* at 1-2. The Government and Mr. Cameron identified five contested issues:

(1) Whether the Court should consider, in imposing sentence, the conduct underlying the vacated counts;
(2) Whether specific offense characteristics for distribution, USSG § 2G2.2(b)(3)(B), and sadistic depictions, *id.* § 2G2.2(b)(4), apply;
(3) Whether Mr. Cameron is subject to the two-point obstruction of justice enhancement under USSG § 3C1.1;
(4) What portion of the sentence is to run consecutively pursuant to 18 U.S.C. § 3147; and
(5) The total appropriate sentence, considering all these and other 18 U.S.C. § 3553(a) factors.

*Gov't's Mem.* at 2; *Def.'s Mem.* at 1.[3],[4] The Court addresses the first four issues in this Order; it will address the amount of restitution and the total sentence at Mr. Cameron's sentencing hearing.

---

[3] The parties listed acceptance of responsibility under USSG § 3E1.1 as an issue. *Gov't's Mem.* at 2; *Def.'s Mem.* at 2. However, in his sentencing memorandum, Mr. Cameron concedes that, with the counts grouped for Guideline calculation purposes, he is not entitled to a reduction for acceptance

## II.     DISCUSSION

### A.     Conduct Underlying the Vacated Counts

#### 1.     Position of the Parties

##### a.     The Government

The Government argues that Mr. Cameron's now vacated sentence is part of one "sentencing package," and that all of the counts (both vacated and affirmed) relate to the same underlying conduct—Mr. Cameron's "handling of child pornography." *Gov't's Mem.* at 10.  In the Government's view, all counts overlap in time, equipment, and online screen names.  *Id.*  Specifically, the vacated counts involve movement of child pornography from Mr. Cameron's computers to "Yahoo[!] photo albums and briefcases, while the upheld counts involve movement [of child pornography] to other users" during online chat sessions.  *Id.*  The Government views the vacated and affirmed counts as so closely interrelated that resentencing "should encompass the entire course of conduct." *Id.*

Second, the Government argues that the First Circuit's vacatur of the counts was on technical, Confrontation Clause grounds, not on a finding that Mr. Cameron was factually innocent of the charges.  *Id.* at 11.  In the Government's view, First Circuit precedent permits the Court to consider the conduct underlying counts vacated on grounds other than factual innocence.  *Id.* (citing *United States v. Macciola*, 891 F.2d 13, 17 (1st Cir. 1989)).  The Government also argues that the

---

of responsibility.  *Def.'s Mem.* at 15 ("[Mr. Cameron] acknowledges that for the purpose of the advisory Guideline calculation, he does not receive a reduction").  The Court concludes that Mr. Cameron waived the acceptance of responsibility issue and the Court has not addressed it.

[4]     "The 2012 Guidelines Manual, incorporating all guideline amendments, was used [by the PO] to determine the defendant's offense level."  PSR ¶ 30 (citing USSG § 1B1.11).

Confrontation Clause rights that led to the vacaturs are inapplicable at sentencing. *Id.* (citing *United States v. Luciano*, 414 F.3d 174, 179 (1st Cir. 2005); *United States v. Rodriguez*, 336 F.3d 67, 71 (1st Cir. 2003)). The Government could, it contends, have declined to charge the now-vacated counts, obtained convictions on the upheld counts, and then proved the additional conduct at a lower standard of proof during sentencing. *Id.* At sentencing, there would have been no Confrontation Clause problems with the evidence, even if the evidence were inadmissible at trial. *Id.* at 11-12.

Third, the Government argues that the evidence underlying the six vacated counts is "substantial and reliable." *Id.* at 12. The Government observes that the First Circuit did not find the evidence unreliable; the holding was, rather, that Mr. Cameron should have had the right to confront the Yahoo! employees who made the initial reports of child pornography. *Id.* Because in its view the evidence is reliable, the Government urges the Court to consider it at sentencing. *Id.*

Fourth, the Government argues that if the Court sentences Mr. Cameron without considering the conduct underlying the six vacated counts, "it will be sentencing [Mr. Cameron] for something far less than what he actually did." *Id.* This is so, according to the Government, because the six vacated counts cover a much broader time period and a much larger number of images than did the upheld counts. *Id.* at 12-13. The vacated counts also demonstrate, in the Government's

view, "a level of intentional concealment of activity that the upheld counts alone do not support."[5]  *Id.* at 13.

### b. Mr. Cameron

Mr. Cameron argues that the Court should not consider the images reported to NCMEC by Yahoo! because they are unreliable.  *Def.'s Mem.* at 3, 5.  In his view, the reports were not just testimonial but also made by an unknown person(s), *id.* at 3-5; he argues the reports were similar to that of "anonymous tips."  *Id.* at 5-6.  He contends that consideration of unreliable information at sentencing, without independent corroboration, violates Mr. Cameron's procedural due process rights.  *Id.* at 3-5.  He places the burden to prove the reliability of the evidence on the Government, and argues that the Government has not met its burden because it cannot prove the identities or qualifications of the Yahoo! employees who submitted the NCMEC reports, or the process by which the specific images were obtained and transmitted ultimately to the Government.  *Id.* at 5-6.

As further evidence that the NCMEC reports do not bear indicia of reliability, he points out that the First Circuit remanded the case to this Court rather than upholding it under the doctrine of harmless error.  *See id.* at 6-7.  This means, in Mr. Cameron's view, that because the Government has not "added [any] new evidence, the vacated counts remain insufficient."  *Id.* at 7.

---

[5]     In its memorandum, the Government anticipated that Mr. Cameron would request that the Court categorically ignore all reference in the PSR to Yahoo! activity, and the Government urged the Court to reject that request.  *Gov't's Mem.* at 13-16.  The Government cites evidence of Yahoo!-related conduct from the PSR not affected by the First Circuit's decision.  *Id.*  Mr. Cameron, however, never made that request.

### c. The Government's Reply

The Government argues that evidence at trial renders the NCMEC reports reliable. *Gov't's Reply* at 1-4. First, it contends that evidence of Yahoo!'s internal procedures by which child pornography images were identified, verified, and referred to NCMEC make the reports themselves reliable. *Id.* at 2-3. It cites extensive evidence of these internal procedures from the trial record. *Id.* Second, it cites evidence that the process by which the NCMEC referrals and photo archives were retrieved from Yahoo! servers and turned over to the Government was also reliable. *Id.* at 3-4. This, in the Government's view, makes the NCMEC reports unlike an anonymous tip, where nothing is known about the person providing the information or the means by which he obtained it. *Id.* at 4.

### 2. Analysis

In its original Sentencing Order, the Court calculated the number of images under USSG § 2G2.2(b)(7)(C) to equal between 300 and 600 images, a four-level sentencing enhancement increase. *Cameron*, 2011 U.S. Dist. LEXIS 24878, at *25-33. In the PSR, consistent with the Court's earlier finding, the PO concluded that 546 images were attributable to Mr. Cameron and recommended that the Court impose a four-level increase under USSG § 2G2.2(b)(7)(C). PSR ¶ 38. Mr. Cameron objects to the PO's recommendation and asserts that there are only 179 images of child pornography attributable to Mr. Cameron. *Def.'s Mem.* at 7 ("The defendant accepts the calculation made by probation from the draft report of 179 images"). Under Mr. Cameron's calculations, there would be a three-level as opposed to a four-level enhancement under USSG § 2G2.2(b)(7)(B). For purposes of this Order,

the Court assumes that the difference between nearly 600 and 179 images is the number of images associated with the vacated counts. The issue narrows to whether the Court should consider the images of child pornography attributable to the counts the First Circuit vacated.

Federal law permits a sentencing court to broadly consider a defendant's conduct and background when sentencing him. Title 18 of the United States Code § 3661 states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Sections 1B1.3 and 1B1.4 of the Sentencing Guidelines implement this principle. Section 1B1.3(a)(1) directs the Court, in calculating a Guideline range, to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Section 1B1.4 allows the Court, in imposing a sentence within the range defined by the Guidelines, to "consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."

Section 1B1.3 also instructs a sentencing court to consider all "relevant conduct" in determining the applicable Guideline range. Relevant conduct includes evidence otherwise inadmissible against the defendant. For instance, a sentencing

court may consider evidence a defendant successfully suppressed, *United States v. Acosta*, 303 F.3d 78, 86 (1st Cir. 2002); and evidence inadmissible at trial. *United States v. Phaneuf*, 91 F.3d 255, 261-62 (1st Cir. 1996). A court may also consider uncharged conduct, *United States v. Polk*, 508 F. Supp. 2d 89, 98-99 (D. Me. 2007), *aff'd*, 546 F.3d 74 (1st Cir. 2008); charged but not yet convicted conduct, *United States v. Anonymous Defendant*, 629 F.3d 68, 76-77 (1st Cir. 2010); conduct underlying dismissed counts, *United States v. Graciani*, 61 F.3d 70, 74 (1st Cir. 1995); and acquitted conduct. *United States v. Paneto*, 661 F.3d 709, 715 (1st Cir. 2011). The Confrontation Clause is inapplicable at sentencing. *Luciano*, 414 F.3d at 178-80.

Under § 1B1.3(a)(2), the Guidelines require that a sentencing court determine the base offense level by considering "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."[6] USSG § 1B1.3(a)(2). Also, § 1B1.3(a)(3) provides that a sentencing court must consider "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions." In *United States v. Hoey*, 508 F.3d 687 (1st Cir. 2007), the First Circuit addressed the concept of relevant conduct under the child pornography Guidelines and noted that "[f]or the enhancement under section 2G2.2(b)(4) to apply, there is no requirement that the sadomasochistic image be one of the images underlying the

---

[6]     This Guideline provision is applicable only "with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." USSG § 1B1.3(a)(2). Under § 3D1.2(d), offenses under § 2G2.2 are to be grouped. Therefore, § 3D1.2(d) applies.

conviction. That is because the possession of sadistic images is relevant conduct to Hoey's offense." *Id.* at 690. The same logic applies to the number of images enhancement under § 2G2.2(b)(7).

Mr. Cameron is correct that evidence must have "sufficient indicia of reliability" to be considered at sentencing. *United States v. Zuleta-Alvarez*, 922 F.2d 33, 36-37 (1st Cir. 1990). Here, in the Court's view, the evidence from the NCMEC reports is sufficiently reliable to be considered at resentencing. The First Circuit did not reverse Mr. Cameron's convictions because the evidence was unreliable; it reversed them because during his trial, Mr. Cameron was entitled under the Confrontation Clause to cross-examine the person(s) who created the reports. However, a sentencing hearing is not a criminal trial and the safeguards of the Confrontation Clause are inapplicable. *Luciano*, 414 F.3d at 179 ("Nothing in *Crawford* requires us to alter our previous conclusion that there is no Sixth Amendment Confrontation Clause right at sentencing"). Furthermore, even though the Court does not know the specific identities or qualifications of the Yahoo! employees who created the NCMEC reports, this does not render the reports unreliable; the NCMEC reports are not, as Mr. Cameron suggests, akin to an "anonymous tip." Their reliability rests on Yahoo!'s system of business practices for detecting and reporting child pornography, of which the Court has adequate trial evidence.

Nor does the scope of the First Circuit's remand require that this Court ignore the NCMEC or CyberTipline reports for resentencing purposes. The First

Circuit instructed this Court to undertake a fresh legal analysis of the number of images involved in the offense conduct. *Cameron*, 699 F.3d at 653. Specifically, the *Cameron* Court stated that this Court "may consider in the first instance whether its original calculation of the number of photos attributable to Cameron is still valid in light of the reversal of the convictions on Counts One, Three, Four, Five, Eleven, and Fourteen." *Id.* If the First Circuit had concluded that this Court should not consider the images related to the vacated counts, it would have said so.

In sum, nothing about the remand, the Confrontation Clause, the NCMEC and CyberTipline reports or their provenance requires the Court to decline considering the Yahoo! images, and the NCMEC and CyberTipline reports in imposing a sentence on Mr. Cameron.

Even though the Court has concluded that it has the authority to consider conduct underlying the vacated counts in fashioning a sentence in this case, it will not do so. It is true that the Supreme Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997).[7] Consistent with this holding, the First Circuit has repeatedly allowed a sentencing court to consider acquitted conduct proven by the lower preponderance standard applicable at

---

[7] The Supreme Court recently refused to revisit *Watts*. *United States v. Jones*, 744 F.3d 1362 (D.C. Cir. 2014), *cert. denied*, 574 U.S. __ (2014). However, three Justices dissented, stating that "[t]his has gone on long enough," and urging their fellow Justices to "put an end to the unbroken string of cases disregarding the Sixth Amendment—or to eliminate the Sixth Amendment difficulty by acknowledging that all sentences below the statutory maximum are substantively reasonable." *Id.*

sentencing hearings. *United States v. Marquez*, 699 F.3d 556, 562-63 (1st Cir. 2012); *Paneto*, 661 F.3d at 715; *Anonymous Defendant*, 629 F.3d at 76; *United States v. Gobbi*, 471 F.3d 302, 313-14 (1st Cir. 2006). The Court also accepts the Government's point that the First Circuit's decision in this case did not state or imply that Mr. Cameron was actually innocent of the crimes charged in the vacated counts. Furthermore, if the Government had not charged Mr. Cameron with the conduct underpinning the vacated counts, it could have introduced those images at his sentencing hearing as relevant conduct under the Guideline calculations and for its consideration under the 18 U.S.C. § 3553(a) sentencing factors.[8] *United States v. St. Hill*, No. 13-2097, 2014 U.S. App. LEXIS 18780 (1st Cir. Oct. 1, 2014) (discussing the use of relevant conduct in drug quantity determinations). Finally, the Court takes seriously the Government's point about the victims of child pornography in the vacated counts and the Court agrees that the harm to the victims is sometimes subsumed by judiciary solicitude for the rights of a defendant.

Still, it strikes the Court as fundamentally unfair that this Defendant's sentence should be enhanced based on conduct underlying counts that the First Circuit vacated and the Government later conceded it cannot prove at trial. This Court convicted Mr. Cameron on thirteen child pornography counts and he appealed those convictions largely on constitutional grounds. He succeeded in convincing a

---

[8]     Of course, if the Government had brought a one count indictment against Mr. Cameron based on the NCMEC and CyberTipline evidence alone and if that count had been vacated, the images would not have been used for sentencing purposes.

majority of a First Circuit panel that six of those convictions violated his rights under the Confrontation Clause of the United States Constitution.

He did not do so without a fight. At the original trial, the Government strenuously argued and ultimately persuaded the Court that there was no legitimate Confrontation Clause issue in the admission of the Yahoo! receipts and the NCMEC reports. *Def.'s Mem.* at 6. After the First Circuit issued its split decision, the Government accepted the ruling, and did not ask for reconsideration, for an en banc hearing, or for Supreme Court review. This must mean that the Government has accepted that the majority of the First Circuit panel correctly determined that this Court violated Mr. Cameron's Confrontation Clause rights by admitting the same evidence the Government earlier vigorously urged and successfully persuaded the Court to admit at trial.

From this Court's perspective, Mr. Cameron broke new ground in Confrontation Clause jurisprudence, at least in the prosecution of child pornography cases. In evaluating whether to consider the evidence underlying the vacated counts, the Court is also taking into account that Mr. Cameron—through the successful efforts of defense counsel and against the implacable opposition and later capitulation of the federal prosecutors—clarified that Confrontation Clause protections apply to records of child pornography gathered by Internet service providers and forwarded to NCMEC for federal prosecution. This ruling will significantly affect how countless child pornography prosecutions are prosecuted and defended in the First Circuit. When a defendant secures constitutional rights

on appeal—not just for himself but for others—it seems particularly inappropriate for a resentencing court to consider the conduct in the constitutionally-tainted counts in fixing a defendant's sentence on remand.

For the Court on remand to consider the exact same conduct underlying the vacated counts, placing him for sentencing purposes in the same situation he would have been had he lost the appeal, casts a shadow over the significance of the appeals process. Also, this situation is a variant of acquitted conduct. Unlike some acquitted conduct, Mr. Cameron was not acquitted because a fact-finder found that the Government failed to sustain its burden of proof beyond a reasonable doubt. In that situation, consideration of the same conduct by a preponderance standard is more understandable. But here, the First Circuit vacated Mr. Cameron's convictions because this Court committed an error of constitutional magnitude when it convicted him of the later vacated counts. To consider that same conduct at sentencing opens this Court to the charge that when a defendant exposes its legal error, it will vindicate itself by imposing the same sentence on a defendant as if it was right all along.

Finally, the First Circuit hinted that this Court's consideration of the images underlying the acquitted conduct should not be a foregone conclusion. In its remand order, the First Circuit wrote that "the district court may consider in the first instance whether its original calculation of the number of photos attributable to Cameron is still valid in light of the reversal of the convictions on Counts One, Three, Four, Five, Eleven, and Fourteen." *Cameron*, 699 F.3d at 653. The First

Circuit was certainly aware of *Watts* and its own precedent on a sentencing court's right to consider acquitted conduct and—consistent with that precedent—if it was sure that this Court would count the images from acquitted conduct, there would have been no need for the First Circuit to remand to this Court to reconsider the number of images attributable to Mr. Cameron.

None of this means that the Court will ignore acquitted conduct at resentencing in all cases, if there is good reason to take such conduct into account. But here, by pursuing his appeal, Mr. Cameron vindicated his and others' constitutional rights. The Court accords Mr. Cameron the fruit of his appellate victory and concludes that the number of images is 179 and at resentencing, the Court will conclude that the sentencing enhancement is three levels under USSG § 2G2.2(b)(7)(B).

## B. Enhancement for Sadistic or Masochistic Depictions under USSG § 2G2.2(b)(4)

### 1. Position of the Parties

#### a. The Government

The Government argues that the four-level enhancement for sadistic or masochistic depictions, USSG § 2G2.2(b)(4), should apply to Mr. Cameron.[9] *Gov't's Mem.* at 16. In support of the enhancement, it directs the Court to two images from Count 15—one of the counts the First Circuit upheld. *Id.* One of these two images,

---

[9] When it sentenced Mr. Cameron, the Court issued an extensive sentencing order, explaining its Guideline calculations and the reasons for its sentence. *Cameron*, 2011 U.S. Dist. LEXIS 24878, at *1-58. Typically, to raise issues on resentencing, a defendant would have to demonstrate that he attempted to raise them with the appellate court. Here, the First Circuit did not reach Mr. Cameron's sentencing challenge. *Cameron*, 699 F.3d at 653. The Court assumes that Mr. Cameron properly preserved his current claims of sentencing error.

"eating_13.jpg," depicts a dog licking the crotch area of a naked minor. *Id.* The other, "96-400c2f5f-8ObfOe71-23531cf3-5d1c12f3.cjp," depicts a naked minor bound to a medical table with her legs spread. *Id.* The Government asserts that these two images "qualify under even the most conservative construction of the enhancement." *Id.* The Government concludes by arguing that the Court need not evaluate whether, as it anticipates Mr. Cameron will claim, "penetration of a young child only qualifies if the child is expressing pain." *Id.*

### b.    Mr. Cameron

Mr. Cameron begins by noting that the Court has already rejected the Government's proposition that the two images cited from Count 15 depict sado-masochistic behavior. *Def.'s Mem.* at 10 (citing *Sentencing Order* at 16 n.6 (ECF No. 240) (Mar. 11, 2011)). He observes that there remains for consideration several images from Counts 6, 9, and 13, as identified by the Court in footnote 6 of the Sentencing Order. *Id.* Mr. Cameron concedes that they "appear to depict penetration of a child by a post-adolescent (likely adult) male," *id.* at 10, but he disputes that these represent "sadistic or masochistic conduct" or "other depictions of violence" within the meaning of USSG § 2G2.2(b)(4). *Id.* at 11-12.

Mr. Cameron cites *Hoey*, 508 F.3d 687 for the proposition that mere penetration of a minor by an adult male is not, categorically, sadistic or violent within the meaning of USSG § 2G2.2(b)(4). *Id.* Mr. Cameron highlights that the *Hoey* Court evaluated an image that portrayed "'a young boy with an expression of pain and disgust who is being anally penetrated by the penis of a much older man. The relative sizes of the man's penis and the small boy, *in addition to the boy's*

*expression*, all suggest the likelihood of ongoing pain.'" *Id.* at 11 (quoting *Hoey*, 508 F.3d at 691) (emphasis added by Defendant). Mr. Cameron goes on to quote further language from *Hoey*: "'Here an image of attempted sexual penetration combined with this young child's pained expression is sufficient to establish that the picture is intended to give the viewer pleasure based on the child's actual or anticipated pain.'" *Id.* at 11-12 (quoting *Hoey*, 508 F.3d at 692). He then asserts that "[t]here are no images in this case which show any facial expression of pain or any negative facial expressions of the victim." *Id.* at 12. From this, he concludes, the four-level enhancement should not apply. *Id.*[10]

### 2. Analysis

United States Sentencing Guideline § 2G2.2(b)(4) states:

> If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by **4** levels.

Other than clarifying that this provision applies, "regardless of whether the defendant specifically intended to possess, access with intent to view, receive, or distribute such materials," USSG § 2G2.2 cmt. n.2, the Guidelines "do not specify what constitutes 'sadistic or masochistic conduct or other depictions of violence.'" *Hoey*, 508 F.3d at 691 (quoting USSG § 2G2.2(b)(4)).

First, the Court agrees with Mr. Cameron that the Court previously determined that the two images in Count 15, "eating_13.jpg" and "96-400c2f5f-8ObfOe71-23531cf3-5d1c12f3.cjp," could not count toward the four-level sado-

---

[10]    The Government did not address Mr. Cameron's counterargument regarding the USSG § 2G2.2(b)(4) enhancement in its reply. *See Gov't's Reply* at 1-6.

masochistic enhancement under USSG § 2G2.2(b)(4). *Cameron*, 2011 U.S. Dist. LEXIS 24878, at *23 n.6. These two images were too small for the Court to determine whether the person depicted was a minor. *Id.* The Government has presented no new evidence and the Court is not in a position to reassess its earlier determination. The two images that the Government relies upon to impose the four-level sado-masochistic enhancement are insufficient to carry the Government's burden of proof.

Next, the Court turns to whether other images in the remaining counts of conviction depict adults having sexual relations with prepubescent minors. Again, the Court refers to its previous Sentencing Order in which it found that "the number of images of adults, mostly males, having sexual relations with prepubescent minors under the age of 12 as determined by Dr. Ricci is simply overwhelming." *Id.* The Court listed eight such images in Count 6, two in Count 9, five in Count 13, and five in Count 15.[11] *Id.* Assuming the images depict adult male sexual penetration of prepubescent minors, the Court addresses Mr. Cameron's legal contention that unless the minor appears to be in pain, the sado-masochistic enhancement does not apply.[12]

---

[11] The Court does not remember these individual images. If it is Mr. Cameron's contention that the Court's prior characterization of these images is inaccurate, the Court will review the images to reassess its prior finding.

[12] Again, the Court does not remember the twenty particular images listed in its March 11, 2011 Sentencing Order. In its memorandum, the Government staked its position on the erroneous factual contention, one the Court had earlier rejected, that the two images in Count 15 constituted sado-masochistic conduct. *Gov't's Mem.* at 16. It did not address whether the other images in Counts 6, 9, 13, and 15 also contained images of sado-masochistic conduct. The Court does not know, therefore, whether any of these twenty images show a minor "with an expression of pain and

*Hoey* is instructive. Immediately after Mr. Cameron's first quoted language from this case, the First Circuit wrote:

> We agree with the many circuits which have found that images depicting the sexual penetration of young and prepubescent children by adult males represent conduct sufficiently likely to involve pain such as to support a finding that it is inherently "sadistic" or similarly "violent" under the terms of section 2G2.2(b)(4). *See United States v. Belflower*, 390 F.3d 560, 562 (8th Cir. 2004) (per curiam); [*United States v.*] *Myers*, 355 F.3d [1040, 1043 (7th Cir. 2004)]; *United States v. Kimler*, 335 F.3d 1132, 1143 (10th Cir. 2003); *United States v. Caro*, 309 F.3d 1348, 1351-52 (11th Cir. 2002); *United States v. Lyckman*, 235 F.3d 234, 238 (5th Cir. 2000); *United States v. Delmarle*, 99 F.3d 80, 83 (2d Cir. 1996).

*Hoey*, 508 F.3d at 691-92. Furthermore, the First Circuit wrote that "[a] four-level increase is warranted when a young child has been subjected to the additional pain of penetration or similarly violent conduct." *Id.* at 692. In this Court's view, *Hoey* made it clear that neither "facial expression[s] of pain" nor "images of gratuitous violence," *Def.'s Mem.* at 12, are required to apply the four-level enhancement. *See also United States v. Corp*, 668 F.3d 379, 390 (6th Cir. 2012) ("cases involving the sexual penetration of prepubescent children are inherently sadistic").

In addition, the First Circuit observed in *Hoey* that to focus solely on the pain apparently inflicted on a child at the moment the image was created is too narrow. Discussing what constitutes the portrayal of sadistic conduct, the *Hoey* Court considered not only whether the image depicted actual sadistic conduct, but also the "psychological harm" likely experienced by the child in years to come. *Hoey*, 508 F.3d at 693 ("[T]he amount of emotional harm inflicted will likely correspond to the

---

disgust." *Hoey*, 508 F.3d at 691. If they do, whether the enhancement should be applied absent such an expression would be moot.

severity of the conduct depicted"). Assuming that the Court correctly determined that twenty images in the remaining counts of conviction depicted adult males sexually penetrating prepubescent children, the Court concludes that the images depict sado-masochistic conduct.

The Court will apply the four-level enhancement under USSG § 2G2.2(b)(4).

## C.     Enhancement for Distribution under USSG § 2G2.2(b)(3)(B)

### 1.     Position of the Parties

#### a.     The Government

The Government notes that the Court previously determined that the five-level enhancement applies. *Gov't Mem.* at 16. The Government also distinguishes the cases it anticipates Mr. Cameron would cite on the grounds that those cases involve "peer-to-peer network[s]." *Id.* In such networks, the Government argues, the exchange of images occurs automatically through the users' personal computers, without any interaction between the users themselves. *Id.* at 16-17. By contrast, the Government observes, Mr. Cameron interacted directly with the individuals with whom he traded child pornography. *Id.* at 17.

#### b.     Mr. Cameron

Mr. Cameron argues that a two-level rather than a five-level enhancement applies under USSG § 2G2.2(b)(3) because there was "no quid pro quo exchange" of images in the upheld counts. *Def.'s Mem.* at 8. He argues that "[t]he standard is not mere reciprocal sending of images"; rather, "[t]here must be a 'conditional agreement,' i.e. 'I will send you X if you send me Y.'" *Id.* Mr. Cameron contends that the Court lacks sufficient evidence to make a finding of such an agreement. *Id.*

As the Government anticipated, Mr. Cameron cites cases in which other circuits reversed application of the five-level increase because the defendant did not reasonably believe that he would receive something of value in return for making child pornography images available on peer-to-peer networks. *Id.* at 8-9 (citing *United States v. Spriggs*, 666 F.3d 1284 (11th Cir. 2012); *United States v. Vadnais*, 667 F.3d 1206 (11th Cir. 2012)). Mr. Cameron also directs the Court to *United States v. Rogers*, 666 F. Supp. 2d 148 (D. Me. 2009), in which Judge Singal applied the two-level, not five-level, increase. *Id.* at 9-10.

Mr. Cameron concludes by emphasizing that the evidence only shows that he voluntarily sent images to someone else and that the other person voluntarily sent images to him; he sees no suggestion of a quid pro quo exchange. *Id.* at 10.[13]

### 2. Analysis

USSG § 2G2.2(b)(3)(B) provides for a five-level enhancement "[i]f the offense involved . . . [d]istribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain." Application Note 1 clarifies that in such a transaction, the "thing of value" is the child pornography received "in exchange for other child pornographic material bartered in consideration for the material received." USSG § 2G2.2 cmt. n.1. The note does not limit application of § 2G2.2(b)(3)(B) to "bartering," however: "'Distribution for the receipt, or expectation

---

[13]     The Government did not address Mr. Cameron's counterargument that a two-level rather than a five-level enhancement applies under USSG § 2G2.2(b)(3) in its reply. *See Gov't's Reply* at 1-6.

of receipt, of a thing of value' . . . means any transaction, including bartering or other in-kind transaction . . . ." *Id.* (quoting USSG § 2G2.2(b)(3)(B)).

The Court addressed this issue in its previous Sentencing Order, and none of the exchanges in the upheld counts is materially different from the facts the Court considered in 2011. *Cameron*, 2011 U.S. Dist. LEXIS 24878, at *20-22. In that Order, the Court found it sufficient, for the application of the five-level enhancement, that Mr. Cameron and another user, without any suggestion of quid pro quo trading, exchanged images containing child pornography:

> The trial evidence includes an extended discussion between the "user" and a person with the screen name "kinkybink." Gov't Ex. GX 50E(5)(b). They discuss the fact that Yahoo! closed their accounts and they had switched to "hello," presumably referring to GoogleHello. Referring to GoogleHello, the "user" says, "plus its better for trading pics!" Kinkybink then sent "user" 13 pictures, three of which show prepubescent children engaged in sexual activity. Upon receipt, "user" responds that the images were "WILD." Kinkybink asks for some "pix." User then sends a series of images containing child pornography. This is not all. The trial record contains evidence of numerous chats between the local user, Mr. Cameron, and with others, sometimes with attached images of child pornography and sometimes without the images. The Court need go no further. The Court finds based on the evidence that "user" is Mr. Cameron and contrary to Mr. Cameron's emphasized position in this case, the trial evidence contains sufficient evidence to establish that he bartered images of child pornography for other images of child pornography.

*Id.* at *21-22. The Court did not and does not find it dispositive that there was no direct evidence of a "specific expectation that by sending an image to another, they would send an image to [Mr. Cameron]." *Def.'s Mem.* at 10. Mr. Cameron concedes that the evidence relating to Counts 6, 7, 12, and 13 show Mr. Cameron sending images to users "angiebii" and "kinkybink," and receiving images from them. *Id.* at 8. That is sufficient circumstantial evidence from which the Court infers that Mr.

Cameron exchanged child pornography for other child pornography. *Cameron*, 2011 U.S. Dist. LEXIS 24878, at *22 ("[T]he trial evidence contains sufficient evidence to establish that [Mr. Cameron] bartered images of child pornography for other images of child pornography").

Mr. Cameron's caselaw reinforces this conclusion. In *Spriggs* and *Vadnais*, the Eleventh Circuit held that it is inappropriate to apply the five-level increase when the user distributes and collects images of child pornography using a peer-to-peer network. *Spriggs*, 666 F.3d at 1287-88; *Vadnais*, 667 F.3d at 1209-10. As the Eleventh Circuit notes, most peer-to-peer file sharing networks permit users to download files without making their own files available for upload in exchange. *Spriggs*, 666 F.3d at 1288; *Vadnais*, 667 F.3d at 1209. Without more evidence of exchange, the Eleventh Circuit concluded that this fact does not allow the inference that the distribution was quid pro quo. *Spriggs*, 666 F.3d at 1288 ("Because the transaction contemplated in the Guidelines is one that is conducted for 'valuable consideration,' the mere use of a program that enables free access to files does not, by itself, establish a transaction that will support the five-level enhancement").

In *Vadnais*, the Eleventh Circuit explained that "[t]here must be some evidence, whether direct or circumstantial, that a defendant reasonably believed that he would receive something of value by making his child pornography files available for distribution through a peer-to-peer network. Such evidence must show the connection between the defendant's distribution and the receipt or expectation of receipt of a thing of value." 667 F.3d at 1209. Here, by contrast to *Spriggs* and

*Vadnais*, Mr. Cameron interacted with another user in semi-real time, and they sent each other images in direct succession. That is the evidence of a quid pro quo lacking in *Spriggs* and *Vadnais*.

*Rogers* is no different. In *Rogers*, Judge Singal refused to apply the five-level enhancement when a defendant allowed other users to access a video of child pornography from his computer using a peer-to-peer network. 666 F. Supp. 2d at 149. Judge Singal ruled that, although the defendant may have installed the peer-to-peer software with the expectation that he would be able to access child pornography, none of the uploads of the video to other users was "in exchange" for child pornography because there was no quid pro quo connection between any specific upload and any of the defendant's downloads. *Id.* at 154 ("Mr. Rogers must have distributed child pornography for the receipt of a thing of value—not installed LimeWire for the receipt of a thing of value"). Here, by contrast, there is convincing evidence that Mr. Cameron exchanged specific photos with "angiebii" and "kinkybink" and received specific photos in return. *Def.'s Mem*. at 8.

In sum, there are no meaningful differences between the exchanges in the upheld counts and the exchanges the Court considered in its 2011 Sentencing Order, and no intervening law mandates a different result. The Court hews to its previous conclusion that the five-level enhancement for distribution for a thing of value under USSG § 2G2.2(b)(3)(B) applies to Mr. Cameron.

**D.     Enhancement for Obstruction of Justice under USSG § 3C1.1**

    **1.     Position of the Parties**

       **a.     The Government**

The Government argues that the two-level obstruction of justice enhancement should apply to Mr. Cameron because his flight from Maine to New Mexico, in violation of multiple bail conditions, disrupted the resolution of the criminal charges against him, violated the Court's release order, and needlessly consumed the resources of the United States Probation Office, the United States Marshal's Service, the Federal Bureau of Investigation, the United States Attorney's Offices in Maine and New Mexico, and the United States District Courts in Maine and New Mexico. *Gov't's Mem.* at 19-20. The Government characterizes this waste as "vast investigative, prosecutorial and judicial resources invested in finding [Mr. Cameron] and returning him to Maine." *Id.* at 20.

       **b.     Mr. Cameron**

Mr. Cameron contends that the two-level obstruction of justice enhancement should not apply to him because he did not escape from custody or fail to appear for any scheduled proceeding. *Def.'s Mem.* at 12. He cites application note 5(D) of USSG § 3C1.1 as authority that "avoiding or fleeing from arrest does not ordinarily support" the enhancement. *Id.* He disputes that application note 4(E), which covers "'escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding,'" applies to him. *Id.* (quoting USSG § 3C1.1 cmt. n.4(E)). Mr. Cameron cites a Second Circuit case, *United States v. Bliss*, 430 F.3d 640 (2d Cir. 2005) in support of his position. *Id.* at

13.  He asserts that *Bliss* stands for the proposition that mere flight to avoid arrest falls short of the requirements for obstruction of justice.  *Id.*

Mr. Cameron also argues that his flight had no bearing on the child pornography prosecution because he did not miss any court dates.  *Id.* at 14 (citing *United States v. Scott*, 405 F.3d 615 (7th Cir. 2005)).  He further contends that he did not provide any materially false statement to law enforcement that obstructed or impeded the official investigation or prosecution of the instant offense, as contemplated in application note 4(G).  *Id.*

Finally, Mr. Cameron argues that application of the enhancement, along with a sentence for his contempt conviction, would amount to impermissible double punishment.  *Id.* at 14-15 & n.4 (citing *United States v. Perry*, 30 F.3d 708 (6th Cir. 1994); *United States v. Williams*, 922 F.2d 737, 739-40 (11th Cir. 1991)).[14]

### 2.  Analysis

#### a.  USSG § 3C1.1—Obstruction of Justice

USSG § 3C1.1 provides for a two-level enhancement where

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

Application note 4(E) specifically includes "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding" as conduct that gives rise to the enhancement.  *Id.* § 3C1.1 cmt.

---

[14]    The Government did not address Mr. Cameron's counterargument that he should not be assessed a two-level enhancement under USSG § 3C1.1 in its reply.  *See Gov't's Reply* at 1-6.

n.4(E). However, "avoiding or fleeing from arrest" is conduct not normally covered. *Id.* § 3C1.1 cmt. n.5(D).

### b. The Guideline Calculations in the PSR

In the PSR, the PO determined that under USSG § 3D1.2(c), multiple counts must be grouped for purposes of its Guideline calculations because "one of the counts embodie[d] conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." PSR ¶ 32; USSG § 3D1.2(c).

The PO noted that the criminal contempt charge under docket number 13-cr-00001-JAW may be grouped with the child pornography charges because "the Criminal Contempt charge can be accounted for through the application of an enhancement for Obstruction of Justice, under § 3C1.1." PSR ¶ 32. Applying USSG § 2J1.1, the PO viewed USSG § 2J1.6—the Guideline provision for failure to appear by defendant—as the most analogous offense to conduct underlying the charge of criminal contempt and concluded that the total offense level for criminal contempt was 18. *Id.* The PO compared the total offense level of 18 for criminal contempt with the total offense level of 41 for the child pornography offenses and used the child pornography offense level because it was higher. *Id.* As a result, the PO proposed a total offense level of 41, which includes a two-level enhancement for obstruction of justice under § 3C1.1. *Id.* ¶¶ 33-45. Based on a total offense level of 41 and a criminal history category of I, the applicable Guideline range for imprisonment is 324 to 405 months. *Id.* ¶ 73.

Finally, the PO noted that there are two statutory provisions implicated in Mr. Cameron's sentencing. First, the maximum term of imprisonment for the child pornography counts is 20 years and the Guideline range for all counts significantly exceeds the 20 year maximum. *Id.* ¶ 72. Second, under 18 U.S.C. § 3147, the penalty for an offense committed while on release is a maximum term of imprisonment of ten years in addition to the sentence prescribed for the underlying offense. *Id.*

### c. Fleeing Arrest or Escaping Before Sentencing

Mr. Cameron's first argument against application of the obstruction of justice enhancement is easily resolved. USSG § 3C1.1 describes two types of conduct; one falls outside the scope of § 3C1.1 and the other falls within. The Guidelines state that among examples of conduct not ordinarily covered by this enhancement is "avoiding or fleeing from arrest." USSG § 3C1.1 cmt. n.5(D). The Guidelines also provide that "escaping or attempting to escape custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding" are examples of covered conduct. *Id.* § 3C1.1 cmt. n.4(E). Mr. Cameron correctly notes that he was not technically in custody, and therefore, did not escape or attempt to escape, nor did he fail to appear as ordered for a scheduled judicial proceeding. *Def.'s Mem.* at 12 ("[T]here was no escape and Cameron never missed a court date"). But Mr. Cameron's argument misses a crucial difference between flight before arrest and flight after arrest while on bail. In *United States v. McCarthy*, 961 F.2d 972 (1st Cir. 1992), the First Circuit addressed a defendant who failed to appear at a sentencing hearing after being convicted. *Id.* at 975. As in this case, once the

defendant disappeared, the sentencing court revoked the defendant's order of release, issued an arrest warrant, and after the defendant was arrested, the district court applied the two-level obstruction of justice enhancement. *Id.* The First Circuit affirmed the district court's application of the obstruction of justice enhancement. *Id.* at 979-80. It concluded that "flight after arrest constituted an obstruction of justice" under the then-existing version of the Guidelines. *Id.* at 980.

The factual difference between *McCarthy* and Mr. Cameron's case is that, unlike *McCarthy*, the Court had not set a date for the resentencing hearing when Mr. Cameron took flight. The Court does not view this distinction as meaningful. In its decision, the First Circuit remanded Mr. Cameron's case for resentencing, and therefore, resentencing was inevitable. Although this Court had not set a date for the resentencing hearing by the day after the decision—the day when Mr. Cameron disappeared—the First Circuit had ordered the Court to hold a resentencing hearing, which could not take place without him. Mr. Cameron's sudden flight from the District of Maine would have made the scheduling and holding of a resentencing hearing in Mr. Cameron's absence an exercise in judicial theater. That Mr. Cameron did not actually fail to show up for a scheduled hearing does not diminish the plain fact that he disappeared in an effort to avoid the resentencing hearing, and thus, obstructed justice. *See United States v. Abuhouran*, 162 F.3d 230, 234 (3d Cir. 1998) (Defendant who cut an electronic monitoring bracelet while released on bail to home confinement and was arrested at the airport properly received obstruction of justice enhancement).

Mr. Cameron's authority to the contrary is unpersuasive. He cites *United States v. Stites*, 56 F.3d 1020 (9th Cir. 1995) for the proposition that "[t]o disappear from the jurisdiction and not disclose one's whereabouts to the government does not warrant enhanced punishment." *Def.'s Mem.* at 13. But Mr. Stites was only under investigation, not arrest, when he left California. *Stites*, 56 F.3d at 1022. The *Stites* Court itself distinguished the facts in *Stites* from the situation where a defendant "had already been arrested for his offense and was expected to surrender himself." *Id.* at 1026 (internal citations and quotation marks omitted).

Similarly, Mr. Cameron cites *United States v. Bliss*, 430 F.3d 640 (2d Cir. 2005) for the same proposition. *Def.'s Mem.* at 13. However, in *Bliss*, the defendant left the jurisdiction and used an alias "prior to the filing of criminal charges." *Bliss*, 430 F.3d at 642. The *Bliss* Court concluded that the defendant's actions amounted to little more than "'simply disappear[ing] to avoid arrest.'" *Id.* at 648 (quoting *United States v. Alpert*, 28 F.3d 1104, 1107 (11th Cir. 1994)). The *Bliss* Court does not suggest that if a defendant (such as Mr. Cameron) fled the jurisdiction after being convicted of a crime, was out on bail, and was awaiting sentencing, his flight would not constitute obstruction.

Mr. Cameron claims *United States v. Scott*, 405 F.3d 615 (7th Cir. 2005) stands for the proposition that an obstruction enhancement should be reversed "where there was a violation of conditions of release but no missed court appearances." *Def.'s Mem.* at 14. But in *Scott*, the defendant engaged in "pretrial antics" that flouted the court-ordered terms of his community confinement. 405

F.3d at 617. Even so, the Seventh Circuit observed that his bail violations did not make it "more costly or otherwise more difficult for the government to prosecute its case against him successfully." *Id.* at 618. The same can hardly be said for Mr. Cameron, whose disappearance caused extensive trouble for law enforcement in tracking him down in New Mexico. *See* PSR ¶¶ 15-18.

### d. Specific Intent to Obstruct Justice

There is some authority from the Second Circuit that to apply a two-level obstruction of justice enhancement, a district court must find that the defendant had "the specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice." *United States v. Woodard*, 239 F.3d 159, 162 (2d Cir. 2001) (internal citations and quotation marks omitted). This is drawn from the language of USSG § 3C1.1, which imposes the obstruction of justice enhancement only if the defendant acted "willfully." USSG § 3C1.1. The First Circuit has not yet resolved the question of whether there must be a showing of a defendant's "specific intent to obstruct justice" for the enhancement to apply. *See United States v. Hall*, 434 F.3d 42, 61 (1st Cir. 2006).

For purposes of this Order, the Court assumes that the First Circuit may follow the Second Circuit. Under Second Circuit law, "[i]n determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all the reasonable inferences that may be drawn from the evidence." *United States v. Carty*, 264 F.3d 191, 194 (2d Cir. 2001). The standard is by a preponderance of the evidence. *Id.* The Second Circuit has observed that "a

willful avoidance of a required judicial proceeding such as sentencing is inherently obstructive of justice." *Id.* at 195.

Based on the record before it, the Court finds that Mr. Cameron fled the jurisdiction with the specific intent to avoid the resentencing hearing that the First Circuit ordered. Mr. Cameron did not flee from arrest; he fled from pre-sentencing release while under supervision by the Probation Office. When Mr. Cameron disappeared, he had been sentenced to 192 months in prison, had served only about 12 months of the original sentence, had been out of prison on bail for 15 months while the appeal was pending, and he fled immediately after the First Circuit affirmed seven of his child pornography convictions. As a former state prosecutor, Mr. Cameron immediately knew the ramifications of the First Circuit's November 14, 2012 decision: that his bail would shortly be revoked, that he would return to prison and that, upon resentencing, he faced an extended period of incarceration even after the appellate decision.[15]

In addition, the PSR reveals that while he was on the run, Mr. Cameron attempted to cash two fraudulent checks—one in the amount of $42,000 made out on November 23, 2012 and the other in the amount of $32,000 made out on November 27, 2012. PSR ¶ 16. The payor in both checks was Foremost Insurance Company and the payee in each was James Cameron, d/b/a Corvus Watch Company. *Id.* While in Arizona on November 28 and 29, 2012, Mr. Cameron

---

[15] The PSR reveals that Mr. Cameron's ex-wife told the supervising officer on November 15, 2012 that Mr. Cameron had visited her home on November 14, 2012 and she confirmed that "the defendant was aware of the 1ˢᵗ Circuit Court of Appeal[s'] decision in his case, was 'not doing well,' and had told their son he was going back to prison." PSR ¶ 15.

approached an ATM on two occasions and swiped his card.  *Id.* ¶ 17.  The PSR states that it appears Mr. Cameron was attempting to determine whether either of the fraudulent checks had gone through.  *Id.*  They had not.  *Id.* ¶ 16.

Law enforcement was also able to establish that Mr. Cameron had received a legitimate check from Foremost Insurance Company dated on October 30, 2012, after he cancelled his motorcycle insurance policy.  *Id.* ¶ 17.  On November 8, 2012, he had made a purchase through Advantage Laser Products, a company that sells blank check paper and pre-printed checks.  *Id.*  A police expert concluded that the fraudulent checks were original printed checks, not "washed" checks, a process in which the information on the check is erased and changed.  *Id.*  Comparing the legitimate check from Foremost Insurance Company with the two fraudulent checks, the PSR notes that the "eight-digit check number on the valid check was almost identical" to the fraudulent checks, except for one digit.  *Id.*

With all of this evidence, the Court finds that Mr. Cameron had the specific intent to flee the District of Maine to avoid resentencing.  The Court finds that he prepared in advance for his flight by obtaining a means to produce fraudulent checks and to obtain the cash necessary to effect his flight, and that once the First Circuit issued its opinion, he put this plan into action.  The Court finds, based on the close timing between the First Circuit decision and his disappearance, that Mr. Cameron cut his GPS monitoring device and fled the District of Maine in order to escape the incarceration consequences of the First Circuit's opinion.

This is not precisely "escaping or attempting to escape from custody before . . . sentencing," but it is a close variant. Mr. Cameron's release conditions prohibited him from tampering with his monitoring device and from leaving the state. The Court finds, as a matter of fact, that it is more likely than not that Mr. Cameron had a specific intent to obstruct his own sentencing and that he took concrete steps both before and after the First Circuit decision to carry out his specific intent.

### e. Multiple Uses of a Single Sentencing Fact

There remains so-called "double-punishment." *Def.'s Mem.* at 14-15. This issue arises because the Government is seeking a consecutive sentence on the contempt of court conviction related to his flight from bail and is also seeking a two-level enhancement for obstruction of justice related to his absconding from the District of Maine. *Id.* at 15.

Under the literal language of § 3C1.1, this provision applies to Mr. Cameron: he willfully obstructed or impeded the administration of justice with respect to his resentencing on his child pornography convictions, and his obstructive conduct related to his offense of conviction and relevant conduct.[16] If the Government had not charged Mr. Cameron separately with contempt of court, there would be no question that Mr. Cameron would have merited a two-level obstruction of justice enhancement for absconding.

The Guideline commentary addresses certain situations where the obstruction of justice enhancement would be inapplicable. *See* USSG § 3C1.1 cmt.

---

[16]     The Court quoted § 3C1.1 in full on page 28 of this Order.

n.7.  In essence, it provides that the obstruction of justice enhancement should not ordinarily be applied when the defendant is convicted of an underlying crime similar to obstruction of justice, such as contempt, obstruction of justice itself, perjury, or failure to appear by a material witness or defendant.  *Id.*  The commentary reads:

> If the defendant is convicted of [a crime similar to obstruction of justice] . . . this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself.

*Id.*  This means that in the Guideline calculations for his contempt of court conviction, Mr. Cameron should not be subject to an obstruction of justice enhancement under § 3C1.1.  Consistent with this proposition, in the PSR, the PO did not apply a two-level obstruction of justice enhancement to Mr. Cameron's contempt of court conviction for the PO's grouping analysis.  PSR ¶ 32.

To this point in the analysis, the obstruction of justice enhancement would be applicable under the Guidelines.  The obstruction of justice enhancement would normally be applied to the underlying child pornography convictions, not to the contempt of court conviction.  The PO's application of the grouping analysis, including both the child pornography and contempt of court calculations, has counted the obstruction of justice enhancement only once in arriving at Mr. Cameron's total offense level of 41.  Mr. Cameron's issue, therefore, is not with the Guidelines.

That Mr. Cameron faces the possibility of "multiple uses of a single sentencing fact"—namely his violation of 18 U.S.C. § 401(3) for contempt of court—is grounded not on this part of the Guideline calculations but on the statutory penalty provision for the commission of an offense committed while on release under 18 U.S.C. § 3147.

By absconding from the District of Maine while on release, Mr. Cameron was, as he has admitted, in contempt of court, a violation of 18 U.S.C. § 401(3) ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . (3) [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command"). A general violation of 18 U.S.C. § 401 contains no specific penalty. *Frank v. United States*, 395 U.S. 147, 149 (1969) (Congress "has authorized courts to impose penalties but has not placed any specific limits on their discretion; it has not categorized contempts as 'serious' or 'petty'"); *In re P.R. Newspaper Guild Local 225*, 476 F.2d 856, 858 n.1 (1st Cir. 1973) ("Congress has left the penalty for criminal contempts within the discretion of the district court"). But by committing an offense while released, Mr. Cameron subjected himself to the penalty provisions of 18 U.S.C. § 3147(1):

> A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense to (1) a term of imprisonment of not more than ten years if the offense is a felony. . . .

18 U.S.C. § 3147(1). Under this statute, any penalty the Court imposes for Mr. Cameron's contempt of court conviction must be consecutive to the penalty for his

child pornography convictions. 18 U.S.C. § 3147 ("A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment"). In § 3C1.3, the Guidelines echo the statutory penalty set out in § 3147 by providing that "[i]f a statutory sentencing enhancement under 18 U.S.C. § 3147 applies, increase the offense level by **3** levels." USSG § 3C1.3.

Mr. Cameron cites two cases in support of his contention that his contemptuous conduct may not serve as a basis for both an obstruction of justice enhancement and a contempt sentence: *United States v. Williams*, 922 F.2d 737 (11th Cir. 1991) and *Unites States v. Perry*, 30 F.3d 708 (6th Cir. 1994). *Def.'s Mem.* at 14-15. In *Williams*, the defendant had been convicted of (1) drug trafficking, and (2) criminal contempt, for which he was sentenced to six months in prison for refusing to testify after receiving a grant of immunity in the trial of a co-conspirator. 922 F.2d at 738. When the defendant came for sentencing on the drug trafficking offense, the district court applied the two-level enhancement for obstruction of justice for the criminal contempt under § 3C1.1 in calculating his Guideline sentence range. *Id.* at 739. Quoting § 3C1.1, the *Williams* Court concluded that the "plain language of the guidelines" were violated by sentencing the defendant "again for the same conduct" for which he had already been sentenced. *Id.* at 740.

In *Perry*, the Sixth Circuit addressed a case where a district court judge had sentenced a defendant to six months in prison for refusing to comply with a court order that required him to shave his beard at trial; the six month term of

imprisonment was "to be served consecutively to any term imposed" in a charged bank robbery. 30 F.3d at 709. When the defendant appeared for sentencing on the bank robbery conviction, the sentencing court enhanced his sentence under § 3C1.1 in part for the same conduct—the refusal to shave—for which he had been sentenced to six months imprisonment. *Id.* Citing *Williams*, the *Perry* Court vacated the district court's sentence on the ground that the sentencing court had enhanced the bank robbery Guideline calculations when the defendant "previously had been sentenced to a six-month term for contempt based on the very same conduct." *Id.* at 712.

To the extent that the *Williams* and *Perry* decisions are based on the language of the Guidelines, the Court has some respectful reservations.[17] But what

---

[17] The *Williams* Court acknowledged that the defendant's refusal to testify "clearly constituted conduct within [§ 3C1.1]." 922 F.2d at 739. But it then quoted the language in the commentary: "Where the defendant is convicted for an offense covered by § 2J1.1 (Contempt) . . . this adjustment is not to be applied to the offense level for that offense except where a significant further obstruction occurred . . . ." *Id.* at 739-40 (quoting USSG § 3C1.1 cmt. n.6 (current version as it relates to this case at USSG § 3C1.1 cmt. n.7) (2012)). The *Williams* Court concluded that the "plain language" of the Guidelines prohibited application of the obstruction of justice enhancement to the defendant's drug trafficking conviction. *Id.* at 740. Relying on *Williams*, the *Perry* Court reached the same conclusion. *Perry*, 30 F.3d at 712.

The Court respectfully disagrees. In the Court's view, the term, "that offense," in the commentary must refer to the earlier phrase—"Where the defendant is convicted for an offense covered by § 2J1.1 (Contempt) . . . this adjustment is not to be applied to the offense level for *that offense*" (emphasis added)—namely, for the contempt offense covered by § 2J1.1.

The notion is that if the defendant stands convicted, for example, of contempt, which is a form of obstruction of justice, the Guidelines have already taken the obstructive nature of the conduct into account in establishing the base offense level for that crime, and to add an enhancement for the same conduct would not be appropriate. But the Guidelines do not provide that where a defendant has been convicted of another offense—like drug trafficking—the obstruction of justice enhancement should not be applied to that other offense. If the Guidelines had intended to prohibit application of § 3C1.1 whenever a defendant had been convicted of an offense similar to obstruction of justice, it could have easily said so. In fact, after deciding *Perry*, the Sixth Circuit affirmed the application of an obstruction of justice enhancement under § 3C1.1 for a drug-trafficking defendant's perjured testimony in the trial of a co-defendant. *United States v. Walker*, 119 F.3d 403, 405-07 (6th Cir. 1997).

makes Mr. Cameron's case different from *Williams* and *Perry* is that the consecutive nature of the penalty is by function of a statute, not the Guidelines. The Sixth Circuit expressed concern about "the imposition of an enhanced sentence for one offense from essentially the same factual predicate of a separate offense that has been already calculated into the latter sentence" but noted that this would be true unless Congress had indicated an "express intent to provide for multiple punishments." *United States v. Phillip*, 948 F.2d 241, 257 (6th Cir. 1991). Here, Congress has expressly mandated under 18 U.S.C. § 3147 that the punishment for committing an offense while on release must be consecutive, and in light of which, the Court would be in treacherous territory to ignore the statutory mandate. The Guidelines recognize the consecutive nature of the § 3147 punishment, *see* USSG § 3C1.3 cmt. n.1, and Mr. Cameron has conceded as much. *Def.'s Mem.* at 17 ("When imposing the final sentence, the defense anticipates the court will allocate some portion of the final sentence to § 3147 to be served consecutively"). In addition, although the Guideline provides that an obstruction of justice enhancement is not applicable to certain underlying offenses, the Guidelines did not include convictions for offenses committed while on release among those inapplicable offenses.

In short, there is no statutory justification for exempting Mr. Cameron's contempt of court offense from the operation of 18 U.S.C. § 3147(1) and no Guideline justification for exempting his obstruction of justice enhancement from the

operation of the Guideline calculations.[18]   Assuming that the Court's refusal to impose a consecutive sentence under 18 U.S.C. § 3147 would be a non-starter, the final leg in this analysis is whether the disinclination against multiple punishments for the same conduct is so strong that the Court must excise the obstruction of justice enhancement from the Guideline calculation.

The Court turns to the First Circuit's guidance on "multiple use." "Double counting in the sentencing context 'is a phenomenon that is less sinister than the name implies.'" *United States v. Lilly*, 13 F.3d 15, 19 (1st Cir. 1994) (quoting *United States v. Zapata*, 1 F.3d 46, 47 (1st Cir. 1993)).   Just last year the First Circuit observed that the "use of the term 'double counting' to refer to permissible multiple uses of a single sentencing fact carries with it the misleading suggestion that

---

[18]   The Court does not agree with the Sixth and Eleventh Circuits' conclusion that USSG § 3C1.1 cmt. n.7 precludes application of the obstruction of justice enhancement to a defendant's conviction that is based on a non-obstruction offense.  *See supra* note 17.  However, even if the Court adopted the Sixth and Eleventh Circuits' interpretation, Mr. Cameron would still be subject to the enhancement.

Pursuant to application note 7, "[i]f the defendant is convicted of an offense covered by § 2J1.1 (Contempt) . . . this adjustment is not to be applied to the offense level for that offense *except if a significant further obstruction* occurred during the investigation, prosecution, or sentencing of the obstruction offense itself."  USSG § 3C1.1 cmt. n.7 (emphasis added).  The Court readily concludes that Mr. Cameron's conduct leading up to and during the violation of his release conditions constitutes "a significant further obstruction."  As previously discussed, the Court finds that (1) Mr. Cameron prepared in advance for his flight by purchasing blank check paper and pre-printed checks, less than one week before the First Circuit issued its order; (2) at some point, he fashioned two fraudulent checks to supply cash for his flight; (3) he fled the District of Maine one day after the First Circuit issued its order for a resentencing hearing to avoid the consequences of the Order; (4) while on the run, he attempted to cash the two fraudulent checks that he had fashioned to support his flight; and (5) his conduct forced law enforcement to engage in a two week manhunt to find him in New Mexico.  This evidence supports the finding of "a significant further obstruction."  For a discussion of "a significant further obstruction" in the context of perjury, *see United States v. McCoy*, 316 F.3d 287, 288-89 (D.C. Cir. 2003) (holding that it was proper to apply the obstruction of justice enhancement to a defendant's perjury conviction where defendant "repeat[ed] the same perjured testimony at her criminal trial that she made during an earlier bankruptcy proceeding . . . . Lying under oath to protect oneself from punishment for lying under oath seems to us—and to the Supreme Court—to be precisely the sort of 'significant further obstruction' to which Note 7 refers" (citing *United States v. Dunnigan*, 507 U.S. 87, 97 (1993)).

something unfair or improper had occurred." *United States v. Fiume*, 708 F.3d 59, 61 n.2 (1st Cir. 2013). The *Fiume* Court suggested that "courts and lawyers would be well-advised to use less pejorative language and to speak only of 'multiple use.'" *Id.* In many cases, double-counting is "perfectly proper," but in some cases, the Guidelines expressly forbid it. *Lilly*, 13 F.3d at 19. The First Circuit instructs sentencing courts to "go quite slowly in implying" prohibitions on double-counting where the Guidelines do not explicitly forbid it. *Id.*

Here, the Guidelines expressly forbid applying the obstruction enhancement to the offense level "for that [contempt] offense," but do not forbid its application to the offense level for the underlying conviction (i.e., child pornography). USSG § 3C1.1 cmt. n.7. Mr. Cameron has not brought to the Court's attention any First Circuit authority stating that a contempt of court enhancement will not apply when there is an obstruction of justice enhancement to the offense level for the underlying conviction. *See Def.'s Mem.* at 12-15. Following *Lilly*, the Court will not imply a prohibition.

Mr. Cameron showed a clear intent to obstruct justice by fleeing to avoid sentencing, and he took concrete actions to give effect to that intent. Indeed, but for the efforts of federal law enforcement agencies, he would have likely succeeded. During his more than two weeks on the lam, he did not reconsider and turn himself in and he forged and attempted to cash two bogus checks in order to fund his deeper disappearance. As a consequence of his actions, federal law enforcement expended considerable resources to track him down and arrest him in New Mexico. In this

situation, the Guidelines do not forbid application of the obstruction enhancement, and thus, the Court will apply it.

The Guidelines, however, are advisory, a "starting point and the initial benchmark" in the Court's sentencing analysis.[19] *Gall v. United States*, 552 U.S. 38, 49 (2007). At the sentencing hearing, Mr. Cameron has a right to argue that the application of the obstruction of justice enhancement in the Guideline calculation and of a consecutive penalty in the statute for the same conduct results in a sentence that is too harsh under the factors set forth in 18 U.S.C. § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85 (2007).

### E.     Application of 18 U.S.C. § 3147

Under USSG § 3C1.3, the Guidelines provide that "[i]f a statutory sentencing enhancement under 18 U.S.C. § 3147 applies," the offense level should be increased by three levels. USSG § 3C1.3. The parties agree that the Court should apply this provision by adding a three-level enhancement. *Gov't Mem.* at 24-25; *Def.'s Mem.* at 16-17. The portion of the sentence attributable to § 3147 must run consecutively. 18 U.S.C. § 3147; USSG § 3C1.3 cmt. n.1. The Guidelines suggest that the Court should first determine the overall "total punishment," then designate on the judgment form what portion of the sentence will run consecutively. USSG § 3C1.3 cmt. n.1.

---

[19]     Mr. Cameron must be well aware of this. His original Guideline range for imprisonment was 262 to 327 months and the Court sentenced him to 192 months. *Tr. of Proceedings* 78:18-20 (ECF No. 263) (Mar. 10, 2011); *J.* at 2.

### F.  The Guideline Calculations Applying § 3C1.1 and § 3C1.3

Even though the Court concludes that both § 3C1.1 and § 3C1.3 must apply, the Guideline calculations in this case swallow the impact of the § 3C1.3 enhancement. Thus, the Guideline calculation for the contempt of court conviction starts with a base offense level of 6 under § 2J1.6(a)(2); a nine-level increase under § 2J1.6(b)(2)(A) because the term of imprisonment for the underlying offense is more than 15 years; and a three-level enhancement under § 3C1.3 because Mr. Cameron committed the contempt of court offense while on release for another federal offense, for a total offense level of 18. PSR ¶ 32. The Guideline calculation for the child pornography offense is 40, which includes the two-level enhancement for obstruction of justice under § 3C1.1. *Id.*

Because conduct underlying Mr. Cameron's contempt of court conviction results in an adjustment under § 3C1.1 to the Guideline calculation for the child pornography offense, the contempt of court and child pornography offenses must be grouped. USSG § 3D1.2(c). The impact of the grouping in this particular case is to lose § 3C1.3 for Guideline calculation purposes because the total offense level, including the three-level enhancement under § 3C1.3, is only 18, and therefore, is eclipsed by the total offense level of 40 for the child pornography offenses.

This does not mean that, taking the Guideline calculations as the starting point for its sentencing analysis, Mr. Cameron will go unpunished for his flight while on bail. Far from it. If he had not been convicted of contempt of court, he would have avoided a two-level increase under § 3C1.1 and on remand, under the Court's new calculations, would have had a total offense level of 38, a Guideline

sentence of 235 to 293 months. This would have contrasted with the original Guideline calculation of 39 for a Guideline range of between 262 and 327 months. The two-level obstruction of justice enhancement caused by his flight drives his total offense level to 40, for a Guideline range of between 292 and 365 months.

### G. Other Matters

#### 1. Restitution

In the PSR, the PO recommended restitution in the total amount of $5,400.00. PSR ¶ 85. The PO noted that "the only victim who has requested restitution in this case is Jan_Feb" and it recommended that the Court order restitution in the total amount of $5,400, which represents the cost of one year's counseling.[20] *Id.* ¶¶ 19, 85.

In his memorandum, Mr. Cameron concedes that under *United States v. Kearney*, 672 F.3d 81 (1st Cir. 2012), the Government's requested restitution amount of $5,400 is correct. *Def.'s Mem.* at 17. Mr. Cameron objects, however, on the basis that "there is no evidence of proximate cause between the restitution suggested and the actual conduct of James Cameron." *Id.*

---

[20] The Court is confused by this statement. In its Sentencing Order, the Court referenced a request for restitution from an attorney for "Amy" of the "Misty" series. *Cameron*, 2011 U.S. Dist. LEXIS 24878, at *56-57. The Court concluded based on prior rulings in the District of Maine that "Amy's" claim failed due to lack of causation. *Id.* at *57.

The Court is unclear whether the "Amy" claim remains viable. The Court did not delineate the count under which the "Amy" images were found and it may be that the images were found in one or more of the counts that the First Circuit vacated or that "Amy" in the "Misty" series is the same victim as "Jan_Feb." Either may be correct because the Government did not object to the PSR's statement that only the victim in the Jan_Feb series presented a claim. PSR ¶ 85. If not, it would seem that "Amy's" restitution claim is still pending. The Court notes that "Amy" in this case may be the same "Amy" in *Paroline v. United States*, 134 S. Ct. 1710, 1716 (2014) ("[A] young woman, who goes by the pseudonym 'Amy' for this litigation").

In *Kearney*, the First Circuit rejected the argument of a child pornography defendant that he should not pay restitution to the victim because he was not the actual or proximate cause of any losses she may have suffered. 672 F.3d at 95-99. The *Kearney* Court held that "the proximate cause requirement was satisfied here, because [the defendant's] actions resulted in identifiable losses as outlined in the expert reports and [the victim's] victim impact statements." *Id.* at 99-100. It was sufficient, in the court's view, that the identifiable victim had "affirmatively requested restitution." *Id.* at 100. Furthermore, "[i]n calculating the dollar figure owed in restitution, the court need only make a 'reasonable determination of appropriate restitution.' 'Absolute precision' is not required." *Id.* (quoting *United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir. 1997); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005)).

After the parties filed their memoranda, the Supreme Court decided *Paroline v. United States*, 134 S. Ct. 1710 (2014), which addressed restitution in the context of possession of child pornography. In *Paroline*, the Supreme Court concluded that "[r]estitution is [] proper under [18 U.S.C.] § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Id.* at 1722. At the same time, the *Paroline* Court observed that "the victim's costs of treatment and lost income resulting from the trauma of knowing that images of her abuse are being viewed over and over are direct and foreseeable results of child-pornography crimes, including possession, assuming the prerequisite of factual causation is satisfied." *Id.* The Supreme Court rejected the argument that a person, like Mr. Cameron,

who anonymously downloads a series of images of child pornography thereby becomes responsible for "the victim's entire losses from the ongoing trade in her images." *Id.* at 1726.

Yet, the *Paroline* Court recognized that "[w]ith respect to the statute's remedial purpose, there can be no question that it would produce anomalous results to say that no restitution is appropriate in these circumstances." *Id.* The Supreme Court urged sentencing courts to "order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id.* at 1727. In the "Amy" case, the *Paroline* Court wrote that the amount of restitution should not be "a token or nominal amount" but should "not be severe." *Id.* The Supreme Court described a number of factors a sentencing court might wish to consider:

> the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.

*Id.* at 1728. But the *Paroline* Court emphasized that the calculation rests upon the exercise of the court's "discretion and sound judgment." *Id.*

After *Paroline*, the First Circuit addressed this issue in *United States v. Rogers*, 758 F.3d 37 (1st Cir. 2014). In *Rogers*, the district court issued a restitution award of $3,150, which represented the cost of 18 therapy visits. *Id.* at 39-40. The

*Rogers* Court commented with approval regarding what the district court reviewed before making its restitution award and its methodology:

> The court considered a chart submitted by the government showing the individual amounts of restitution orders to Vicky that had been entered in past cases. The district court excluded past costs and based its award on an estimate of Vicky's future therapy costs, occasioned by defendant's conduct. It first limited the losses to general losses from 'continuing' traffic in Vicky's images from the period when defendant had viewed them. It then distinguished the future therapy losses attributable to defendant from the harm resulting from other viewers and from Vicky's therapy needs relating to her father and the difficulty of her relationships with male friends. The court further considered the fact that several other defendants had been sentenced and ordered to pay restitution for possessing images of Vicky, and that defendant viewed the images and may also have shared them through a file sharing program. The court commented that it would select a restitution figure representing the cost of 18 therapy visits, but noted that 50 visits would also have been a reasonable conclusion. The court picked a figure at the low end. On the basis of these factors, the court entered a restitution order of $3,150.

*Id.*

Guided by the Supreme Court and the First Circuit, the Court will review whatever information the parties and the victim(s) place before it. From what is now before the Court, the Court rejects Mr. Cameron's position that it should not issue any award of restitution; some restitution will be appropriate. At sentencing, the Court will attempt to issue neither "a token" nor too "severe" an award. *Paroline*, 134 S. Ct. at 1727.

### 2. Multiple Personalities

At the presentence conference, the Court asked both sides for briefing on whether Mr. Cameron's use of different online personae correlated with different offense conduct. The Government argues that Mr. Cameron's unlawful behavior

was consistent across personae, and Mr. Cameron does not object. *Gov't's Reply* at 4-6; *see Def.'s Mem.* at 1-18. The Court will not consider Mr. Cameron's distinct personae in its sentencing decision.

## III.  CONCLUSION

The Court

(1)     will not count the images of child pornography underlying the vacated counts and will apply the three-level enhancement under USSG § 2G2.2(b)(7)(B);

(2)     will apply the four-level enhancement for sadistic or masochistic conduct under USSG § 2G2.2(b)(4);

(3)     will apply the five-level enhancement for distribution in exchange for a thing of value under USSG § 2G2.2(b)(3)(B);

(4)     will apply the two-level enhancement for obstruction of justice under USSG § 3C1.1; and

(5)     will apply the three-level enhancement under USSG § 3C1.3.

Pursuant to this Order, Mr. Cameron's Guideline calculation results in a total offense level of 40 and a criminal history category of I, establishing a Guideline sentence range of 292 to 365 months. As the PSR notes, for each of the child pornography convictions in Counts 6, 7, 9, 10, 12 and 13, the minimum statutory term of imprisonment is five years and the maximum is twenty years. PSR ¶ 72 (citing 18 U.S.C. § 2252A(b)(1)). The maximum statutory term of imprisonment for Count 15 is ten years. *Id.* (citing 18 U.S.C. § 2252A(b)(2)). Turning to the contempt of court conviction, the maximum term of imprisonment is life. *Id.* (citing 18 U.S.C. § 401(3)). However, regarding the contempt of court conviction, the Government has represented that it is seeking the sentencing enhancement under 18 U.S.C. § 3147, which requires that any sentence imposed for the contempt of court conviction

be consecutive to any sentence imposed on the child pornography convictions. Under § 3147, Mr. Cameron faces "a term of imprisonment of not more than ten years" as a consecutive sentence on the contempt of court conviction. 18 U.S.C. § 3147(1).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 17th day of October, 2014